THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BERNICE ZALIMAS, Plaintiff in Error.

*Opinion filed December 16, 1925.*

1. CRIMINAL LAW—*when a memorandum is not admissible to prove sale of poison.* In a prosecution for murder by the administration of arsenic, a memorandum of a druggist showing a sale of arsenic on a certain day to a woman giving the name of the defendant is not admissible in evidence, where the druggist, after examining the memorandum, has no recollection of the person to whom he sold the poison except that it was a woman, is not able to identify the defendant as the woman and cannot recall the day on which he sold the poison, as a witness may use a memorandum only to refresh his memory and after doing so to testify to such facts as he is able to remember.

2. SAME—*when testimony in regard to sale of arsenic to retail drug store is not competent in prosecution for murder.* In a prosecution for murder by the administration of arsenic, testimony of a wholesale drug clerk identifying a record made by a telephone clerk of a sale of arsenic, over the telephone, some months before the homicide, to a retail druggist from whom it is sought to prove the defendant purchased the poison, is incompetent, not only because it is hearsay, but as having no tendency to prove the defendant's guilt.

3. SAME—*what evidence is admissible to show motive.* In a prosecution of a defendant for the murder of her husband, the defendant may be asked on cross-examination whether she had ever had sexual intercourse with another man with whom the evidence for the People tended to show she was on intimate terms, where on·direct examination she denied having any improper relations with him.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM V. BROTHERS, Judge, presiding.

EUGENE L. MCGARRY, (OTTO L. KOLAR, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Bernice Zalimas was convicted in the criminal court of Cook county of the murder of her husband, Dominick Zalimas, by poison, was sentenced to fourteen years' imprisonment in the penitentiary and has sued out a writ of error, contending that the judgment is not sustained by the evidence, that there is a reasonable and well-founded doubt of her guilt, that incompetent evidence was admitted over her objection, and that other errors occurred on the trial.

The evidence against the plaintiff in error was entirely circumstantial. While there was evidence tending strongly to show that arsenical poisoning was the cause of death, it is contended that this was by no means proved beyond a reasonable doubt, but rather that there is good reason to believe that the cause of death was pneumonia, and that even if the death is found to have been caused by poisoning, the evidence does not show that the poison was administered by the plaintiff in error.

It appears from the evidence that the plaintiff in error was born in Lithuania, Russia, in May, 1901, and came to America when she was fourteen years old. She went to school as far as the eighth grade, studied several months in a business college, worked for Swift & Co. for five years and became a saleswoman in a women's store. Her mother died on October 3, 1921, and she lived with her father, Ignatz Martikonis, in the second story of 4804 Lincoln street. She had known Dominick for three years, had kept company with him for two years and was married to him on July 3, 1924. She testified that they had a regular wedding,—a four-day wedding, from Thursday through Sunday,—and they lived afterward with her father. She no longer worked away from home after her marriage. Dominick was also a Lithuanian, was thirty-five years old and had been in this country about eighteen years. For several years he had been employed as a carpenter-trimmer on passenger cars by the Illinois Central Railroad Company at its Burnside shops, earning $32 a week. He was attending a night school three nights in the week, studying naprapathy,—a system of drugless healing,—and he also practiced psychological healing, maintaining an office, where he went three nights in the week and received his patients. He became ill on November 15 and died on November 18. A post-mortem examination was made by Dr. Irving H. Porges, a coroner's physician, who removed the stomach with a small part of the duodenum attached, the kidneys and about one-fifth of the liver, and sent them to Dr. William D. McNally, who was a toxicologist and chemist of the coroner, for a chemical examination. His examination disclosed the presence of arsenic trioxide in the stomach and other organs and indicated arsenical poisoning as the cause of death. The timekeeper of the railroad company testified that Zalimas worked at the railroad shops up to and including November 15. No physician saw him until Monday, November 17, when Dr. Michael Strikol saw him

about twelve o'clock at his home, in bed. He told the doctor that he had pains in his chest and the pit of his stomach and that he had vomited. On examination the doctor found tenderness in the pit of the stomach, the pulse and temperature normal and nothing abnormal in the chest. He prescribed a sedative and calomel, told Mrs. Zalimas that her husband had the grippe, and testified that the patient's appearance and general condition at that time were good. He. did not see him afterward alive. The doctor testified that he was familiar with the symptoms of arsenical poisoning and did not believe at that time that there was arsenical poisoning and did not find any symptoms of such poisoning. The People also introduced Charles Bubacz, a broker and notary public, who testified that on November 19, the day after her husband's death, the plaintiff in error came to his office in the early part of the evening with a man whom she introduced as Dr. Wilson, saying that she wanted a statement from the doctor with a notarial public seal attached. At the request of Bubacz the doctor sat down at a desk and wrote on a prescription blank a statement which was identified by Bubacz and was introduced in evidence, as follows:

*"To whom it may concern*—This is to certify that I saw Dominick Zalimas, 4804 S. Lincoln street, about 6 P. M. on the 18th day of November, 1924, and that it is my professional opinion and belief that he had an attack of pneumonia and endocarditis from which he died a few hours later.          H. L. WILSON, M. D."

Bubacz attached to this his notary's certificate that Dr. Wilson appeared before him and acknowledged the statement of his own free and voluntary will. This is substantially all the evidence introduced by the People tending to show the condition of Dominick and the circumstances of his illness and death.

Evidence was introduced for the purpose of showing a motive for the crime and preparation for its execution. Prior to their marriage Dominick told the plaintiff in error

that he had saved $3000. After the marriage he had his life insured for $5000 for the benefit of his wife and her life was insured for $1000 for his benefit. Anna Skverecki, a school girl of the high fifth grade, eleven years old, testified that she was a flower girl at the wedding, and that she lived with the plaintiff in error two or three weeks before the wedding and two weeks afterward. The flat consisted of six rooms, three of which were bed-rooms. After the wedding she occupied the front room with the plaintiff in error and slept with her every night. Dominick occupied the middle room and the father the rear bed-room. Dominick went to work at five o'clock in the morning. Anna knew Leo Kalinowski and saw him every day, because he was the bakery man. The plaintiff in error would talk to her about him all day long. The plaintiff in error told her to watch for him by the window and if he came to call her. After she called her the plaintiff in error would send Anna to the store or somewhere. Almost every day after the wedding the plaintiff in error would come to the window and call Kalinowski into her house and then send Anna out, giving her money to buy cream, or ribbon, or a band, or candy. When she sent Anna out there would be no one in the house but Kalinowski and herself. Anna would be gone about fifteen minutes, and when she returned the plaintiff in error would be letting Kalinowski out. Anna further testified that she saw the plaintiff in error and Kalinowski in a booth in a beauty shop, curtained off by a wide curtain, which was about two feet from the ground. Anna, stooping down to pick up a file which she had dropped, looked up under the curtain and saw the plaintiff in error and Kalinowski kissing.

Dominick left the plaintiff in error about a month before his death, taking his trunk and leaving the house. Alfons Zalim testified that he was present at the plaintiff in error's home, with his brother, about two months before Dominick died. The plaintiff in error, her father, Ignatz

Martikonis, her two uncles, Stanley and Pete Martikonis, and Dominick, were present, besides the witness and his brother, Bernard Zalim. They were in the front room, about eight o'clock in the evening. Stanley Martikonis asked what they were all there for, and Dominick said he wanted to let them know why; that he wanted a nice way to separate from Bernice; that he wanted to have a woman a wife and not a friend; that she didn't take care of his clothing nor make the meals for him, and most times she was out and he had to take care of all that himself; that she came home late at night drunk, and he once found glass in the cabbage,—that it looked like ground glass; that she went out with Kalinowski and a lot of other men. Then Bernice said that was foolish talk when Dominick said he found glass in the cabbage; that he did not trust her; that he didn't bring any money and give it to her, and all she could have was him as her husband. She said that before he married her he told her or Stanley Martikonis that he had about $3000, and she never saw any of that money and he always watched her. Then Dominick said that after he married her he gave her $200 and a pay check for $74, and after, about three weeks, he had to get the wedding pictures and she asked for money to pay for these pictures, and he asked her what she had done with the money. Zalim testified that after two weeks Dominick came to live at his house. His wife did not come with him. After he left Zalim's house he returned to live with his wife about two weeks before he died. Bernard Zalim, brother of Alfons, testified of the meeting to which Alfons testified, to substantially the same effect.

Charles Ruben testified that he had a drug store a few blocks from 4804 Lincoln street and on November 8, 1924, sold some arsenic to a woman. He had no recollection of the woman, but he made a memorandum at the time of the sale of the name of the woman, the amount of arsenic and the purpose for which it was sold. He identified the memo-

randum but said he did not recall the date; that he only
saw what the memorandum said; that looking at it he did
not recall the name that was given him though he did re-
call the purpose, which was to kill rats.   He had seen Mrs.
Zalimas for three or four years a great many times but did
not know her name until this case came up in court.   He
did not identify her as the person to whom he sold the
arsenic, but testified that he could not say that he deliv-
ered the package to her and could not say whether she was
the person to whom it was delivered or not.   The memo-
randum about which he testified was admitted in evidence
over the plaintiff in error's objection, and is as follows:

"*November 8th, 1924.*

"Bernice Zalimas,
     4804 S. Lincoln Street.
   1# Arsenic.
         To poison rats.                         Paid 75 cents."

Stella Stanczk testified that she lived on the first floor
at 4804 Lincoln street, the second floor of which was occu-
pied by the plaintiff in error and her husband and father.
She saw the plaintiff in error on the day before her hus-.
band died.   When she came down-stairs there were some
bones lying there and she gave the bones to Mrs. Stanczk's
two dogs, and the dogs commenced to vomit and had diar-
rhea, and they continuously drank water.   There was an
attic in the house, and on Monday, November 17, she was
up there, hanging up the wash, and there was nothing there.
On Wednesday, the day after Dominick's death, she went
up to take down the wash and there was a bad odor, like
"black carbolic," and she found a box, some powder and
two small bottles.   In one of the bottles was a sort of black
carbolic and in the other bottle was some white powder.
They were in the attic, underneath some papers and rags.
She hid the box back of another box so that the children
would not come in contact with it and hid the bottles under
papers.   When she went to the attic again, the day before

Thanksgiving, the plaintiff in error was moving away. They were talking in the attic, and she asked the plaintiff in error, speaking about the powder in the box which was on the floor, "What kind of poison was that? Didn't she know that it was poison?" and further said that she was afraid her children would come in contact with it. The plaintiff in error took the powder in her hand and said she didn't know where it came from· or what it was. After the plaintiff in error moved away Mrs. Stanczk went up in the attic again and took the powder away, and the bottles, which had been hidden away separately, were not there. She took the box down-stairs and later gave it to officer Skalla. Dr. McNally testified that its contents were 99 per cent arsenic trioxide. Mrs. Stanczk testified that the attic where the box of powder was found was used by Dominick. He had books there after he was married, but when he moved away all of his personal belongings were taken away,—referring to the time when he separated from the plaintiff in error. Mrs. Stanczk's children went up in the attic when she sent them.

Edward Rex Neely testified that he is a wholesale drug clerk employed by the Fuller-Morrison Company and is assistant sales manager. He had a record showing sales to Charles Ruben, made by a telephone clerk. He identified the handwriting on the record as that of a telephone clerk who was in the employ of the Fuller-Morrison Company on August 4, 1924, but was not so at the time he was testifying. The order was from Charles Ruben, 4800 South Ashland avenue, taken on August 4, and stated that delivery was made on the same date, consisting of one pound of commercialized powdered arsenic, one pound of acide cyanide potassium, and two pounds of writing paper. The package identified by Mrs. Stanczk was shown him, and he stated that it was the kind and description of packages put up by his firm; that it bore the number 211 on the base of the box, which he stated meant that the package was put

319—13

up on the 211th day of the year, and further said he knew the order was filled, as the record showed no complaint of non-delivery, and that the merchandise was paid for.

The plaintiff in error's account of the circumstances attending the illness and death of her husband is as follows: About two weeks before his death he complained about having pains in his back and shoulders, that he did not feel well and had no pep, but that he was working all the time until November 15. On that day he came home and said that he did not feel well; that he had taken a bath over at the shop after work and that he must have come out of that too soon, because he had a chill on the train coming home which lasted half an hour. He could not eat. He was dizzy and ached all over. He took some tea which he made out of herbs for his patients and said that would fix him up. A little while after he vomited. During the night he had a pain in his chest and side, and she had to get up and make mustard plasters and put them on him. Sunday morning he got up, walked around the house and went outside but came back soon. He coughed, and it hurt his chest and he would hold his side. He refused to have a doctor, saying that he would be all right and would take care of himself. Sunday night he began to have an awful fever and headache. He tried to get up, but he was so dizzy that he almost fell. Monday morning he coughed and could hardly speak. On her insistence he finally consented to have a doctor, and she called Dr. Strikol about eleven o'clock. When he came he examined her husband, told her her husband had the grippe and prescribed medicine. She had the prescription filled at the drug store and gave him two doses, but he refused to take it any more, saying that the medicine was rotten and his own medicine would do much better for him. He coughed through the night, would groan, and she could hear a wheezing sound in his throat. On Monday evening her uncle came. He spoke to her husband and asked him if he had had a doctor, and Dominick

said no, he had not, and asked her uncle to go and get a bottle of magnesia. He did so and her husband drank it, and after doing so he vomited. On Tuesday morning he could hardly speak. She knew Dr. Mirowslay Zeman, who had treated her husband for pneumonia two or three years before, as Dominick told her. She called him but he was engaged, so the call was transferred to Dr. Wilson, who came about six o'clock in the evening and examined her husband, put something in his ears like a tube, which he put on Dominick's chest and listened, and then he shook his head and said he had pneumonia. After Dr. Wilson examined him he injected something in the arm which he told her was morphine to quiet him down, because he was out of his head. Dr. Wilson stayed about an hour and then went away, and about an hour later her husband passed away. She denied any knowledge of poison in the house, and stated that she did not buy the package from Ruben, the druggist, and did not buy any poison from him. In regard to the box of powder found in the attic by Mrs. Stanczk, she testified that on the day before she moved she went to the attic to take the rest of the furniture and some of her husband's books and things that were left over. Mrs. Stanczk came up-stairs and called her attention to something spilled upon the floor which looked like powder and asked if she knew anything about that. She took a little in her hand and rubbed it between her fingers. They both wondered what it was, and Mrs. Stanczk said it was poison and asked if she knew where it came from. The plaintiff in error said that she did not know where it came from. This was the first time she had seen it. She said she never gave the little Stanczk girl bones which were fed to the dogs. In regard to her relations with Kalinowski, she denied that she had ever had any improper relations with him, or had ever kissed him except at the wedding, at which he was present. She saw him every day because he was the man who delivered bread at her home. A few days

after the wedding she was in the booth at the beauty shop where Kalinowski and his brother and another lady were. The little girl, Anna, was with her. She did not kiss Kalinowski there. She testified that Anna was a flower girl at the wedding. The plaintiff in error wanted a little girl for a flower girl and didn't know any, so she got this little girl, whom she did not know, through a relative of the little girl. Anna never lived at her house before the wedding. She was there the four days of the wedding but not afterward. She stayed in the house on Thursday, Friday, Saturday and Sunday. The child slept with her while she stayed there. The two slept in the dining room bedroom. The plaintiff in error testified that she and her husband were happy. They had a "little spat." She found out, or he told her, that he wanted to loan $5000 to Bernard Zalim, who wanted to go into the bakery business. She said to him, "Why should you go and loan money to a man whom you really don't know whether he is your cousin or not?" After they were married they planned to buy a home of their own. She said to him that she would work and he would work to buy a home of their own, and if he went and gave his money away he might never get it back. He told her to mind her own business; he knew what he was doing. A little while after that she went to the fruit store, and when she returned she found her husband was gone. His trunk was gone, his clothes were gone, and she didn't know where he went. She was worried and didn't know what to do, and she packed her clothes and went to her uncle's. Her husband was away for five days. She stayed at her uncle Pete's about a week, and finally on Sunday her husband came. He called up and wanted to know if she was there, and her uncle said she was and he had better come over. He came to the bed-room and asked what was the matter, and she said he knew they were married only a little while and for a little spat he left her all by herself. He put his hands around her, and she said

it was merely for a little money; why be grouchy? They made up, went home and were happy just the same as ever. The meeting at her home which the Zalims testified to, at which they said she and her husband, her father and two uncles were present, never occurred. The meeting at her uncle Pete's house was the only meeting which was held. Her husband never said anything about finding ground glass in his cabbage. She said that her husband told her before the marriage that he had $3000, which he kept in a box. She went with the undertaker on the morning after her husband's death to have access to the box. The undertaker wanted some money and she did not have any, and she needed some mourning clothes, but they did not give her access to the box. She knew there was a $5000 life insurance policy in the box, but she did not believe that there was $3000 there. She thought about $1000 was spent on the wedding. There was $535 in the box when it was opened. She went to the notary public the next night with Dr. Wilson, because "the gossipers were going around saying that my husband died too quick," so she called up Dr. Wilson and told him what they were saying, and he said the best thing was for him to give his professional opinion, and they went to a notary public and made the statement. Dr. Wilson told her that her husband died of pneumonia. She further testified that she had seen her husband during their married life take small white pills. She did not know what for and asked him, and he said it made him feel good, and if his stomach didn't work very well he said it would make it peppy. She did not know what he took them for. He kept them in a little glass bottle, in his vest pocket.

Stanley Martikonis testified that he visited at the Zalinas house once or twice a week. When they had meals together he always saw Dominick take white pills from his vest pocket and swallow them with hot water; that he asked him what he took them for, and he said he took them

for his bad breath, and said they made his stomach feel better, too; that after he took the pills he felt better. He talked with Dominick many times about poison, and Dominick told him he was taking that dope,—those white pills,—on account of his bad breath; that he was going to get rid of that. Dominick said he was drafted in the army in war time and wouldn't go to the front in France; that he took the poison and shot it in his leg, and then his leg filled up and he got discharged from the army. He said he was in the hospital over two years getting well from that poison. Witness saw Dominick the last time the day before he died. He was red in the face and said his chest felt sore and his back hurt him. He felt like dropping down to die. Stanley tried to get a doctor to help him, but Dominick always refused. He said he had been sick four or five days, and in answer to the question, "What do you do for your sickness?" he said, "I am taking my own treatment—my own medicine." He asked Stanley to get a bottle of magnesia. Stanley got it from the drug store and Dominick drank the whole bottle and in a short time started vomiting. Stanley denied that there was any such meeting as that testified to by the two Zalims at 4804 Lincoln street. There was a meeting at his brother Pete's house. Dominick and his wife had been separated for a short time and his wife came to her uncle Pete's. Stanley came in and found Dominick there. He shook hands with Dominick and asked him what was the news. Dominick said his wife was sick from worry. Dominick did not sit with Stanley very long. He went in the bed-room. The plaintiff in error lay in bed. Dominick did not come out for an hour and then came from the bedroom with her. They were kissing and loving each other and after awhile Dominick went home with his wife. Nothing was said about ground glass in the cabbage or about the plaintiff in error running around with other men. Stanley never heard "that stuff." The plaintiff in error's father, Ignatz Martikonis, testified that no such meeting as that

which the Zalims testified took place at 4804 Lincoln street ever occurred.

It is contended that the court erred in admitting in evidence, over the plaintiff in error's objection, the memorandum of the witness Ruben of a sale of arsenic on November 8. Ruben had no recollection of the person to whom he sold the poison except that it was a woman. He testified that he knew the plaintiff in error by sight, had seen her a great many times for three or four years, but did not know her name until this case came up in court, when he was told her name. When he sold the poison he did not know the name of the person to whom he sold it, and when he testified he did not recognize the plaintiff in error as the woman to whom he sold it but stated that he could not say whether she was or was not the person. After he stated that he had no independent recollection of the woman to whom he sold the poison he was handed the memorandum and asked if on looking at it he recalled the day on which the arsenic was sold, and he answered that was just what he did not recall,—he only saw what the memorandum said. The memorandum was not admissible as original evidence but it was proper for the witness to use it to refresh his memory and after doing so to testify to such facts as he was then able to remember. He did so testify, but his memory did not enable him to recall the purchaser either as the plaintiff in error or Bernice Zalimas. The memorandum itself was then offered in evidence, but it was not admissible. If admissible in any case, such a memorandum can be received only where the witness testifies that the facts were correctly stated in it at the time it was made. (*People* v. *Krauser,* 315 Ill. 485; *Diamond Glue Co.* v. *Wietzychowski,* 227 id. 338.) The witness did not and could not so testify. He did not know the name of the purchaser but inserted in the memorandum the name which the unknown purchaser chose to give him. It was error to admit the memorandum in evidence, and there was

no evidence connecting the plaintiff in error with the purchase of arsenic.

Objection was also made to the testimony of the witness Neely in regard to the record made by a telephone clerk of a sale made by her over the telephone to Ruben of a pound of arsenic on August 4. This record was not competent evidence against the plaintiff in error. It was hearsay, depending on the credit to be given the telephone clerk who made it, and if the statement of this clerk was to be received, the plaintiff in error had a right to meet her face to face before the jury and to cross-examine her, as well as all the other witnesses. The transaction recorded was also incompetent, being *res inter alios acta.* It had no tendency to prove the defendant's guilt. The fact that a wholesale drug store sold a retail drug store a pound of arsenic in August does not tend to prove that the retail drug store sold arsenic to the plaintiff in error three months later, in November. The only effect of the production of that evidence was to raise a collateral issue and distract the attention of the jury from the issue and induce the jury to attach a factitious importance to the sale of the arsenic by the Fuller-Morrison Company to Ruben as having a tendency to corroborate the latter's testimony and to lead the jury to believe that some consideration should be attached to this sale when it was of no importance in the case. The motion to strike out this testimony should have been sustained.

In the cross-examination of the plaintiff in error the State's attorney was permitted, over objection, to inquire of her whether she had ever had sexual intercourse with Kalinowski, either after her marriage or before. The People had introduced evidence in chief tending to show the relations between the plaintiff in error and Kalinowski, and the question of the existence of improper relations between the plaintiff in error and Kalinowski was a proper subject for inquiry as bearing upon the question of her affection

for her husband and a possible motive for desiring his death. It was not error to permit the examination.

It is strenuously argued that the evidence does not establish the defendant's guilt beyond a reasonable doubt. Since the judgment must be reversed for the errors in the admission of evidence which have been indicated, we express no opinion on this question.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*